Good morning. Now there is one thing that I want to take up. As I understand, the EPA is allotted 15 minutes and Avenal Power is allotted five minutes. So you're agreeable to that. The other side will get a full 20. Okay. I just want to make sure we didn't have any mistake about that. Okay. All right. Good morning. May it please the court, Paul Court for petitioners. With me at council's table this morning are Ingrid Brostrom and George Torgan. If possible, I'd like to reserve five minutes for rebuttal. You can reserve. That doesn't mean we'll let you do it, but you can do it if we can get it to you. Great. We'll have a lot of questions, I expect, but especially in this particular case. Well, this matter involves the EPA's permitting of the large new Avenal Power Plant that will hundreds of tons of new harmful pollution in some of the most hardest hit communities in one of the most polluted regions of the country. In order to approve Avenal's Prevention of Significant Deterioration Permit, or PSD permit, EPA waived key statutory requirements for such permits, even though the act provides no authority for such waiver, and EPA can point to no suggestion that Congress intended to provide such authority. EPA may think that it's being fair, but its decision undermines the very structure and purpose of the Clean Air Act's PSD program by allowing construction of a major pollution source without ensuring that air quality and public health will be protected. Mr. Court, do you represent the Sierra Club? I'm here on behalf of all the petitioners this morning. I want to speak, if I could, about the standing issue. Yes. I want to go there first because it seems to me that's the first place I ought to look at for this Court. As I understand it, and let's maybe Sierra Club can have standing and an association can bring the standing to bring the suit on behalf of its members when the members would otherwise have the standing to sue in their own right. The interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief request requires the participation of the individual members. As I understand it, Sierra Club's person that they suggest gives them this associational standing is Mr. Nip. Bakersfield, correct. Lives in Bakersfield, 90 miles from the plant. Right. As I understand, he takes hiking expeditions in the Sierra Nevada and Santa Monica Mountains, but they're even further away from the plant. Sure. So does he ever get any closer to the plant than 90 miles? There's nothing in his record that suggests that he lives in an area affected by the challenged activity. Well, because we know this is a major new power plant that's being built in the southern part of the valley. But that's not enough. Just because it's a major power plant, if I'm to read what I'm supposed to do as it relates to standing. An individual bringing the claim must establish injury by showing a connection to the area of concern sufficient to be credible, make credible the connection with the life would be less enjoyable, or that he has or will suffer in his degree of aesthetic or recreational satisfaction. Right. And so I'm having trouble with Mr. Nip. Well, then let's move on from Mr. Nip. Let's talk about the other. Okay, let's do that. What about Maria Saucedo? Right. Who No, Ms. Saucedo lives right in Avenal. She doesn't live in Kettleman City? No, Ms. Well, Ms. Sandoval lives in Kettleman City and works in Avenal. And Ms. Mares Altore with El Pueblo lives in Kettleman City. Okay. So I guess I'm worried about the green action person who lives in Avenal, which is Maria Saucedo. Right. Where are the allegations that implicate the EPA actions in Ms. Saucedo's affidavit? She doesn't identify the power plant. She doesn't say how, given the power plant, what we could do would be redressed or whether it would help when she does not mention the plant. Well, she does. She says in region will worsen air quality and jeopardize my health and the health of my family. So that's the best we have? Is that statement? Yes. These are residents of Avenal that are facing a new power plant being built in their backyard. This power plant is going to emit hundreds of tons of pollutants that frankly, where you get it, I don't need your big comment about this. I went through CPDs and El Pueblo's, and I may say this wrong, Mavie Sandoval. And I felt like she was adequate. She was what? She did have standing. Okay. And so I was, I mean, I wasn't sure about Maricela, Maris Alatorra, because she didn't mention the power plant or the EPA decision. But I said, well, Ms. Sandoval, she did. And so there's some standing. Right. And then I looked at Green Action, and I was a little worried about Ms. Saucedo. And so that's why I asked you about those. Yeah, well, again, so we have Ms. Saucedo, who lives right in Avenal and is concerned about a new power plant being built, again, in her backyard. And we have Ms. Sandoval, who lives in Kettleman City and works in Avenal at a clinic treating patients with respiratory diseases, but who also is concerned about her own exposure and the exposure to her family. And the connection to EPA, of course, is that this plant wouldn't be built without EPA's demand of EPA's decision here means that this project cannot go forward, at least as currently proposed. Let me take you to the statute, counsel. Is there anything in the plain language of the Clean Air Act that addresses the situation where the EPA fails to act in a timely fashion and fails to approve the permit within that one year period? Is there anything that specifically addresses this situation, just such that we can say, hey, there's plain congressional intent, and so, therefore, the EPA doesn't have any room to exercise discretion? Well, I mean, Section 165C speaks for itself, and then Section 304 outlines what the remedies are when EPA misses a deadline. And so, the statutory analysis in this case is really the same as the analysis in the case where the EPA had missed a statutory deadline, and the court held that in the absence of specific Clean Air Act provisions that waive other statutory requirements as a consequence of missing that deadline, then the court would not infer one. And the court specifically pointed out that the Act does provide remedies for missing statutory deadlines in Section 304. That's what happened in this case. The result in General Motors, though, turned out differently, because there the court upheld the EPA's decision to enforce current standards. So did General Motors talk about whether a contrary decision would be unreasonable? That, well, it could not have come to it. I mean, it would have had to say that it's somehow possible to infer that there are other remedies in the statute for a failure to miss a deadline. Well, but I think my colleague's question is quite relevant, because it upheld the decision to enforce the standards of the time, even though they didn't meet the one-year deadline. But it seemed more like it was kind of a, well, we're not going to say the EPA acted outside of their discretion. In other words, the EPA could have gone the other way, and we still would have upheld it. And therefore, General Motors could be, instead of a great case for you, a case for the opposition, which would say, if the EPA is trying to make a decision in this kind of a difficult situation, it seems as if they're using their discretion appropriately. But here, EPA has no discretion. This is not a case of enforcement discretion. Section 165A is very plain. It says, no facility may commence construction unless it has demonstrated that the facility will not cause or contribute to a violation of any national ambient air quality standard, and the facility is equipped with the best available control technology for each regulated pollutant. Well, there's no ambiguity in that particular provision, and I think EPA concedes that they would have to, under normal circumstances, apply the regulations in place at the time. But in this particular case, there are two different provisions at play here. So one says apply the air quality standards in place, and then the current air quality standards, and the second provision talks about approving the permit within one year. Approving or denying. Approving or denying within that one-year period. So as I understand EPA's argument, what they're talking about is how do the two sections intersect when or actually the preliminary question is whether the two sections really are in conflict, and there's a failure to address a situation where the EPA fails to comply with one, so what happens to the other? Is there any room for discretion there? Right. I mean, that's how I understood their argument. Yes. And I mean, think about this argument, because there is, in fact, no actual conflict between these provisions. I mean, there's nothing that says that you cannot reconcile these two provisions. The EPA had two options here. Once these new standards were in place, it could not comply with Section 165A. It could not find that this facility had met any national ambient air quality standard or that it had installed best available control technology. It could not comply with 165A and approve this permit. So it had two choices. One, it could have found that now the permit was actually not complete. It could have withdrawn that completion determination, reset the clock. Or, as we've pointed out, it could have denied the permit. Comply with both Section 165A and 165C. I mean, think about what EPA is saying here. They're saying there's no authority. There's nothing in the statute that says, in certain circumstances, you can start waiving plain statutory requirements. What they're saying is because they missed a deadline, now they have new, unbounded authority to start picking and choosing statutory requirements that they can waive. And I'd point out the Clean Air Act is full of deadlines. And that EPA misses those deadlines with some regularity and sometimes with intentionality. And EPA's argument here is that even though Congress provided nothing, not even a hint, that there is a connection between these two provisions. That now EPA has this new legislative authority delegated to it by Congress that it can start to rewrite the plain requirements of the Act. Let me go to something that you said that pricked my thought process here. And that is, what is the remedy that you seek? As I read your brief, the remedy was to deny the permit. The other people, the other parties say, don't deny it, you know, give us more time. And first you said, at the beginning, I thought, to deny it. And then I thought, well, it could go back there. I thought you said it could go back there so that they can pick up where they left off and make sure that they're complying with the new regs. What's your position on that now? That's a fair point. I mean, that is an option. I mean, you know, on the record, it seems like there's no option but to deny it. Option is good. But the question is, what are you advocating? Well, at that level, I think you're right. I'm in the same boat. I was going to ask you the same. But I'd like the other answers. I think you're right. I think a remand and EPA then can figure out what they should do with this permit. I think that is the appropriate remedy. Okay. I want to turn, well, one other point I want to make about the statutory argument here. Are you suggesting that General Motors demands that one uphold the EPA decision to enforce the standards even though they did not meet the one-year deadline? There is no way to comply with Section 165A. You're not answering my question. Okay. Because when I read General Motors, it seemed to me that what the court was saying is, you know, at these situations when there's a problem where the EPA has caused this problem themselves by failing to do what they needed to do within the EPA, the EPA ought to get some discretion in order to make that decision. And that's why they came out with what they did. The EPA said, we're enforcing the standards. We didn't meet the deadline, but we're enforcing them nonetheless. And the court said, okay, but now we got another case. And the case is quite the opposite. In this case, the EPA is not saying we'll enforce the standards. The EPA is saying, you know, we caused this. This is our problem. We're trying to do something to rectify what we did. And I don't read General Motors as turning or upholding EPA's discretion. What General Motors is, is a case about how to interpret the statute, how to interpret the effect of missing a deadline. And the court says, unless Congress provided some remedy, then there is no remedy other, you know, again, then enforcement of under Section 304, which is what happened here. Now, as for suggesting in every one of these instances then, if the EPA misses the deadline, unless somebody submits something to suggest that they're going to meet new standards, the permit should always be denied. Or determined to be incomplete. And let me stress here, EPA has been implementing this program for over 35 years, and this is the first time that EPA has discovered a conflict? It seems highly improbable that the statutory language is so confusing or so conflicted that we'd only be now sort of facing this situation. I mean, what's, again, what's extraordinary about EPA's statutory interpretation is they are claiming legislative authority to rewrite requirements of the statute without any indication that they were given such authority. And this is not, EPA talks about a statutory gap, but there's no gap here. There's no conflict. There's nothing that Congress implicitly left open. This is just statutory silence. And the reason that the statute is silence is because there is no gap. There is no conflict. There's no reason to think that there's a connection between Section 165C and 165A. 165A speaks for itself and is plain and has not been met here. Let me ask you this. If the plan would have been required to meet those standards appropriate at the end of the year rather than at the time of the application, would that make for a different argument? Absolutely. We'd be arguing a different set of facts, and yes. No, but I'm saying if they had said after that year there were some standards in effect after the year, some came in effect long after the year. Supposing the EPA had said, well, based on what we've done in the past, we are going to make this plan meet the standards after that year, would you still say they'd made a bad mistake under the statute? I'm not sure I follow the question. Well, as I understand it, what happened here was the EPA said you only have to meet the standards that were applicable at the time of your application, right? Now the application went in, a year goes by. Supposing they'd said you have to meet the standards that were applicable after the year rather than at the time of the application, would that change the argument? Again, I think if I'm understanding the question, it would in part, and in a way this is what's sort of fortuitous about the way this has played out. If EPA were able to show and put on controls and ensure that this project would not lead to a violation of the one-hour nitrogen dioxide standard, ensure that the public was protected from these impacts, then there wouldn't be the same concern about this proposal. And so the whole framework, standing all of it would change. But we sort of, in a way, caught a break here. And I don't mean we, the petitioners, I mean we, the public, we, EPA, we now have the opportunity to make sure that this plant that looks like it is going to cause health problems because it will lead to a violation of these standards that EPA has adopted to protect public health, that we now have an opportunity to make sure those health protections are in place and that this plant is controlled the way it should be. Well, let me go back to an earlier point a little bit. And that is, in a way, in a sense, there is no gap in the statute between those two sections because the first section says, make your decision in a year. And in the second section, C, says the regulations you have to meet or the application is granted. And that assumes, of course, that EPA did its job in the first place. So what's wrong with that? So just say, and that's what EPA says now, we'll just assume that we did our job and we'll apply the standards that were in effect at the expiration of that one year when we should have decided this in the first place. Isn't that logical? Again, if the ---- It's logical construction of these statutes. Yes, but it's not logical to conclude if you miss that deadline that, therefore, you can start waiving other statutory requirements. That's the connection that's missing here. If we find that there is some ambiguity or conflict between those two provisions for that last question, what's the appropriate level of deference here? Well, again, we believe that, and it, you know, Mead case is certainly not clear. But, you know, given the background of this decision, it looks more like these, the customs letters that were not given Chevron deference in the Mead case. We have here a decision that was announced in litigation. It was not the product of rulemaking. There was no publication of this new interpretation. And it's got no precedential value. And EPA denies that it has any precedential value. So, you know, for those reasons, and I know that EPA submitted a 28-J letter recently saying that these EAB decisions are entitled to Chevron deference. What's peculiar here is the EAB specifically declined to take up this issue. They said, you know, we're not going to rule on this. And so, it doesn't have those hallmarks of precedent, of deliberate agency rulemaking. And, therefore, we believe that, at best, they're entitled to skid more deference under Mead. Thank you. Thank you. May it please the Court. My name is Stephanie Talbert, and I represent EPA in this matter. With me at counsel table is Julie Walters from EPA's Office of Regional Counsel, along with Bill Warren and Jane Lockhart, who represent Avedal. The consolidated positions for review here challenge EPA's action to fix a problem it faced between competing obligations in Section 7475A of the Clean Air Act and Subsection C. It's a one-year deadline. EPA grandfathered the permit from new requirements that came into effect long after the agency's deadline to act. And it did so because it had not promulgated a grandfathering provision in the NO2 National Ambient Air Quality Standards that would have exempted Avedal when it demonstrated difficulty in the modeling requirements to show compliance with the new NO2 NAAQS. I'd like to turn, I think, first to the Chevron analysis, because that seems to be of interest to the Court. It's our position that the statute is silent as to what EPA should do to resolve this conflict between Section 7475A and C. And EPA filled that silence, filled the gap reasonably because it did so consistent with the statutory provisions, the context of them, the purposes of the Clean Air Act. Decades of grandfathering in similar situations and the legislative history that plainly demonstrates that EPA was not supposed to make this permitting program a source of bureaucratic delay. And so what EPA did here carries out Congress's intent as evidenced in legislative history and also in the purposes of the Clean Air Act, which the PSC program. Well, let's talk about how EPA filled the gap and whether it's entitled to Chevron deference in this particular matter. This was a position that EPA came up with in the midst of litigation and made quite clear that it has no precedential value. And so under those circumstances, why is it not Skidmore deference instead of Chevron deference? Well, for a couple of reasons. First, EPA announced its intent to do this in the middle of litigation. It then carried on through the public notice and comment process that is required to do in the permitting context. This was a permit adjudication. EPA is required to do a new supplemental statement of basis in which it explained its rationale for grandfathering the Avanal permit, put that out for public comment, held a public hearing, responded to those comments that it received, and then issued a final decision. And so that is a process that tends to foster fairness and deliberation. Is it a rulemaking process that EPA normally engages in that would then have some presidential value instead of a one-time application to parties that you're in litigation with? It's not. And actually, in the record, EPA explained why it decided to proceed with adjudication versus rulemaking here. And that was because the Avanal permit process was specific to Avanal. And it was the only situation where EPA had before it the facts that it needed to resolve the problem. And although EPA acknowledged that its decision applies only to Avanal in this context, it acknowledged that it was thinking about coming out with a rule that would grandfather other similar sources. Ultimately, it did not because it didn't find other similar sources. But certainly, the process that EPA engaged in tends to foster fairness and deliberation. And also, I mean, we submit that it was precedential in that it laid out EPA's interpretation here. And EPA has since cited to its interpretation. It recently promulgated a revised National Ambient Air Quality Standard for particulate matter. And in doing so, promulgated a grandfathering provision and pointed back to the Avanal decision as a place where it had articulated its authority to grandfather when a conflict arises between A and C. Are you familiar with our case, Price v. Steve Adoring Services? No, Your Honor, I'm not. Okay, well, I wondered. I was the dissenter in that particular case. And that's a case where we said, at least in that context, that positions on statutory interpretation taken by the agency during the course of litigation are not entitled to Chevron deference. I mean, I said, come on, that's a new rule. I've never seen that before. But nonetheless, my colleague said, you're out to lunch, Smith. And I was in the dissent. So I guess I'm trying to figure out why that wouldn't be something I would do here. Well, again, Your Honor, this was not a final action taken in litigation. It was what petitioners referred to. There's no question it's a position was taken in litigation. It was just had a few more frills added to it after the position was taken. Well, in Ms. McCarthy's declaration, she said that the agency intended to grandfather and that there was additional process that needed to happen before EPA could take final action. And that's the action that the Court is reviewing here. It's not reviewing Ms. McCarthy's declaration. It's reviewing EPA's ultimate decision to follow through with grandfathering the permit. The Clean Air Act does allow the EPA to exempt. So the EPA has discretion to exempt certain situations from permitting requirements except as to PSD permits. Is that correct? I'm sorry, Your Honor. Under the Clean Air Act, the EPA does have the discretion to accept certain permitting requirements, but that doesn't extend to PSD permits. Isn't that right? I'm trying to get back to the issue of congressional intent here. I'm not familiar with what provision you're referring to, but it is EPA's position that it does have authority, this grandfathering authority that it has used for decades to exempt permit applicants when new requirements come into effect during the pendency of applications. And each time, EPA has tailored the grandfathering provision depending on the facts at hand, and that's consistent with what EPA did here, tailoring it only to the Avinall permit. Has this happened in a PSD situation previously? I'm not aware that it has. Well, I mean, that's what my colleague was trying to emphasize here. It doesn't seem to us, in looking through anything we could find where this grandfathering might have been done in other places, but really in PSD, we've never seen it happen before. Well, that's because EPA has before been able to anticipate problems with the implementation of revised standards. And as we laid out in our brief, has a number of times included when it comes out with these the transition into the new standards. Here, EPA did not realize until it had promulgated the standards, attempted to get Avinall to demonstrate compliance, worked with them, and realized there were these modeling difficulties, and then realized that grandfathering would be appropriate here. I've got a site for you. It's Section 7661A. And I'm going to paraphrase. But it talks about how the administrator may promulgate regulations to exempt one or more source categories from the operating permit requirements if the EPA finds that compliance would be impractical, infeasible, unnecessarily burdensome, except that the administrator may not exempt any major source from such requirements. So it seems to me that by precluding any sort of exceptions or exemptions with regard to the PSD permits, the Clean Air Act makes it fairly clear that in PSD situations, it might not be waivable. And isn't that what the EPA's chosen to do in this case? It's waived the requirement that the permit comply with current air regulation standards because the EPA failed to comply with the one-year decision-making requirement? Well, certainly EPA would be happy to brief the Court more fully on what that provision means for the PSD program. But again, EPA did promulgate a grandfathering provision right after the PSD program was enacted. It was upheld in the D.C. Circuit under EPA's general rulemaking authority. And in that case, the Court also mentioned even without that rulemaking authority, EPA would have the authority to make the statute work. It's entrusted with carrying out the PSD program, and that's what EPA was doing here, is using that authority to make the statute work. Under Petitioner's reading of the statute, applicants could be subject to a potentially endless permitting cycle because they would submit their application under a certain set of standards. If a new set of standards came into effect during the interim when EPA was considering it, they would either have to demonstrate compliance within the one year, and if they And so the applicant would have to start the process all over again. And that's – and again, if more standards come into effect – Well, start the process all over again or supplement it in order to meet current air quality standards? Well, I'm sure they would supplement what they had already submitted. But again, during EPA's review of that, new standards could come into effect and start the cycle again. And so – Well, but doesn't that happen? I don't know how frequently it happens, but it's certainly not unheard of that new regulations get implemented, and so permit applicants would then have to comply with current standards. That doesn't seem to me to be a novel requirement at all. Well, it happened here, and EPA's answer to that was in these circumstances, the right result is to end the permitting process under the requirements that were in effect at the one-year deadline. And that serves Congress's intent for this permitting process not to be an endless – Correct me if I'm wrong. Well, go ahead. Finish your – it would not be – but as I understand it, and I might be dead wrong, from the time that the application is submitted to the time of approval within that one year, the standards might change, and they'd have to meet the standards that were approved during that one-year period, correct? EPA's general position is that any standards in effect are required to – they're required to show – to show compliance with any standards. At the time EPA makes its decision. So you have sort of an endless thing anyway, it seems to me. So all standards within the year, they have to meet. We're just talking about what standards you don't have to meet if you don't do anything within the year. Isn't that what we're doing? Because if the standard happened during that year, you would require them to meet that standard, would you not, the EPA? Well, that's what happened – well, I understand, unless there was a grandfathering provision, and in many circumstances there are, and that's why this is sort of an unusual circumstance, because there was not when EPA promulgated the NO2 standard. But never with regard to PSD permits, because as I understand it, since at least the 80s, the EPA has consistently taken the position that with regard to PSD permit decisions, you have to comply with the standards in place at the time that the permit is ruled upon or granted by the EPA. That's always been the EPA's position, isn't that right? Unless there's a grandfathering provision, and there often is. The grandfathering provision excludes facilities, depending on the facts, but often when they've submitted a complete application or if EPA has proposed to grant a permit, then the grandfathering provision kicks in and exempts them. With regard to PSD permits in particular? Yes, Your Honor. You might want to give your co-counsel some time. Thank you, Your Honor. I think you're taken in to theirs. They've only got a minute and six left, lest my heart is lenient. Good morning, Your Honor. May it please the Court. My name is Bill Warren. I'm here with Jane Lockhart. I'm also here with the vice president of the Avenal Power Center, Jim Rexall is here. Warren, before you start, tell us the problems that, if any, that Avenal would have if this matter was sent back to the EPA. In other words, you've gone through this whole process, you've litigated a lot, I'm sure you've spent a lot of money on engineering and all that. All of us want clean air, but we also want to turn our lights on. What problems would your client have if this whole matter were just sent back for further analysis by the EPA, as even now Sierra Club says would probably be the appropriate? If we could get a decision right now, that would be terrific. But the problem is that's not the way it works. It would just repeat the cycle that we've been in now for the last four years. We filed an application for a permit in February of 2008. If in fact the court were to remand today, we would have to not only deal with a series of our requirements on nitrogen dioxide that were extremely vexing, not just for my client but for the EPA, which ultimately caused it to change its timing as it relates to us and others, frankly. And I'm going to talk about the 7661 argument that was raised earlier. But the EPA just issued new standards, I think three weeks ago. Those standards are going to go through review and those standards will be in place at some point before the 18 months passes perhaps before we're back in front of this court on another appeal that's going to be filed by these appellants with respect to this particular plant. Their website, and they've said they are here to stop gas-fired power plants. Their argument today started with a large new plant. If you listen to the argument in this case, you might think that this is a Soviet-style coal facility of some kind that's belching pollutants, you know, left and right and harming people. The reality is it's the state-of-the-art facility. It has two GE combustion turbine generators, two heat recovery steam generators, one steam turbine generator and associated equipment. It is the best available control technology available. As a way of comparison, the amount of nitrogen dioxide that is produced by moving vehicles up and down the I-5 corridor is 25.2 tons per day. The stationary source, and this is in the record, the stationary source nitrogen dioxide produced by all stationary sources in Kings County is 2.2 tons per day. This particular state-of-the-art facility, this terrific plant, is limited to .395 tons per day, 144 tons per year, 90% plus, 91% of all nitrogen dioxide produced in Kings County is coming from moving sources. To try to characterize this plant as some horrifically unhealthy plant is just not fair. It is a clean energy source. But that being the case, why would it be so burdensome to comply with current revised air quality standards? We tried to comply with revised air quality standards, and we couldn't do it because the slowed down for a number of different reasons that the EPA can address. But I can point to the San Joaquin Air Quality Control Board, which did some studies with respect to our plant. It had state-of-the-art software. We gave them all kinds of data sets. They ran those data sets. And after running those data sets, the pollutants were at 44% of the standards. And so... Councillor, I hate to cut you off on this, but I really think I felt the same way when Appellants Council got up and told me how bad it was going to be, and how bad you were going to be, and how everybody was going to die. I felt like that was a jury argument. I think this is kind of a jury argument. What I'd like you to do is focus in on what we got in front of us today. Can the EPA do what they did, rather than tell me how good a plant you got? Because they've got to determine that. I raised it, Your Honor, because it was one of five issues. One of the reasons the EPA granted the permit is because of the quality of the plant, but I'll move on beyond that. Judge Wynn, you mentioned 7661A with respect to waiver. I don't see what the EPA did here as waiver. The EPA specifically said they were not engaged in a waiver of 165A. And I actually think to think of it that way begs the question. To say it's a waiver is to adopt the notion that 165A is seen in isolation and is not somehow affected by 165C. But if you step back and you realize that, in fact, those two particular provisions are in conflict with one another, the EPA has to make a decision, and it's not a question of whether or not it's the same decision this Court would make. It's a question of whether or not the EPA was forced into a decision because a statute was not on point with respect to what has been imposed upon my client. My client waited more than a year beyond when it was supposed to have received a yes or a no regarding the permit that it filed. It played by the rules completely. It did so at great expense. It is still doing so at great expense because of the financing overhang on this particular plant in light of the collision between 165A and 165C. So when the EPA specifically says, look, we haven't dealt with this before, but we do see justice and equity playing out here, since it doesn't tell us what we are supposed to do when these two particular provisions collide because of something that we did wrong. That's not a waiver. That's simply the EPA exercising their authority, as they must do, and doing something that's reasonable, even if it's not what this Court would do, even if it's not what the Sierra Club would do. It was a reasonable determination in light of the lack of language in the statute that specifically described what it was supposed to do. And under Chevron, it is entitled to deference. Under Skidmore, it's entitled to deference. If you go through the Skidmore factors, those factors are met as well. And they're met because if you look at the entire history of this particular Act, the Act is very nuanced. The Act is focused on making sure that these air quality standards that everybody embraces, that my client has embraced by paying for a state-of-the-art facility, that those standards are not imposed upon business and the public in a way that gums up the works to the point that nothing can get done. And so when the EPA assesses the collision of 165A and 165C, it has the right to do that through the Chevron analysis. I think that's the standard that you should apply because I do think it's a rulemaking function, yes, with respect to the price case, it was done in the context of litigation, but not really because the decision is not, even though they say it's not precedential, they're being nuanced and careful because of the nature of the decision. It's certainly a decision that was rendered in a way that was above and beyond the confines of this case, Your Honor, and that's why I don't think it's a decision made in litigation. They're looking in this case for the purposes of coming up with a solution regarding the disconnect between 165A and 165C. Thank you very much for your argument, Counselor. I've given you more than your time, and I'll give now the appellant another five minutes. Thank you, Your Honor. I just wanted to hit on a couple things. First, the government talked about how this decision is consistent with the purpose of the statute, and frankly, that is a baffling to petitioners. The purposes that are outlined in Section 160 talk about preventing pollution that harms public health. They talk about preserving and protecting air quality and ensuring that the growth is consistent with the preservation of air resources. None of those functions are served here by putting blinders on and saying, we are not going to assess whether this plant will cause or contribute to a violation of these new standards that we've adopted to protect public health. I mean, for all the discussion of fairness here, the Clean Air Act was set up to protect public health and preserve air quality, and there's no consideration of whether it's fair to add this source, which, again, even according to Intervenors' Counsel, is going to use up 44% of the allowable concentration under this standard. The standard is 100 parts per billion. This plant alone will result in 44 parts per billion of NO2 levels. You add that to the background and the fact that cars are a major contributor, you can see that this corner of the valley is going to have health problems associated with these new emissions. That should be part of the fairness calculation, but it's not even discussed. The endless delay, again, that EPA seems to sort of point to, never happened before. In 35 years, we've never had this situation. Why? Because usually, the permitting facility can put together the analysis, make the demonstration. The facility has not made that demonstration. Even in the years since that approval, there's sort of been this refusal to even evaluate the problem. And the final thing I wanted to highlight is, you know, EPA reiterates over and over again that they've done this grandfathering multiple times. Most of those grandfathering examples that we point out, the first one involved an actual conflict in the statute. That's not the situation here. The surrogate or the grandfathering around the particulate matter standards, that decision was to say that the old standards could be used as a surrogate for demonstrating compliance with the new standards. They didn't waive the standards like they're doing here. They said, as a technical matter, we think a demonstration using these old standards satisfies the statutory requirement, not a waiver of the requirement like they're doing here. So, in this case, EPA said, we are not going to grandfather facilities. We want everyone to demonstrate that they will meet these new one-hour nitrogen dioxide levels. And it's actually interesting too, EPA says, well, they just discovered that there were all these issues around the implementation of the standard, and yet they haven't revoked the page memo that said these standards will be effective and need to be complied with. They haven't waived this requirement for any other facility. This is not about difficulties in implementing the standard. This is about the decision that was made in the course of litigation to try and get out of this and move on. The fairness issue here needs to consider the impacts on the community and really the purposes of the Clean Air Act, which is to prevent this kind of source from being built. Thank you. Thank you very much. Case 11-73342 and case 11-73356, Sierra Club versus the United States Environmental Protection Agency, is submitted, and this court is in recess for the day.
judges: Quist, Smith, Nguyen